UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NO. 3:00CR263(JCH) |
| | : | |
| v. | : | |
| | : | |
| JERMAIN BUCHANAN | : | |
|    a/k/a JERMAINE BUCHANAN | : | |
|    a/k/a "SKI" | : | JULY 21, 2005 |

**GOVERNMENT'S MEMORANDUM IN AID
OF POST-*CROSBY* PROCEEDINGS ON REMAND**

The Government respectfully submits this memorandum in response to the Court's Order dated June 21, 2005, inviting written submissions from the parties on whether the Court should have imposed a non-trivially different sentence if the Sentencing Guidelines had been advisory; and otherwise in aid of proceedings on remand from the United States Court of Appeals for the Second Circuit.

**I.      Procedural History**

On February 11, 2003, the defendant, Jermain Buchanan ("Buchanan") was convicted, following a six-week jury trial, of (1) racketeering; (2) racketeering conspiracy; (3) a VCAR conspiracy to murder Rodrick Richardson in or about June 1999; (4) the VCAR attempted murder of Rodrick Richardson on June 27, 1999; and (5) a conspiracy to possess with intent to distribute and to distribute five kilograms or more of cocaine and 50 grams or more of cocaine base.

On April 12, 2004, the Court sentenced the defendant to a term of life on Counts One, Two and Twelve of the Third Superseding Indictment, and for a term of ten years on Counts Three and Five, all terms to run concurrently. That same day, the defendant timely filed his

notice of appeal.

On April 4, 2005, the United States Court of Appeals for the Second Circuit ordered a limited remand in this case, upon request of the Government, in light of the Supreme Court's decision in United States v. Booker, 125 S. Ct. 738 (2005), and the Court of Appeals' decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005).

On June 21, 2005, the Court issued an Order inviting simultaneous briefing from the parties on the question whether it would have imposed a non-trivially different sentence in the case if the Sentencing Guidelines had been advisory. The instant memorandum is the Government's submission in that regard.

## II.     Purpose of *Crosby* Remand

In Booker, the Supreme Court held that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). As a remedy, the Court severed and excised the statutory provision making the Guidelines mandatory, 18 U.S.C. §3553(b)(1), thus declaring the Guidelines "effectively advisory." Booker, 125 S. Ct. at 757. This ruling results in a system in which the sentencing court, while required to consider the Guidelines, may impose a sentence within the statutory maximum penalty for the offense of conviction. The sentence will be subject to appellate review for "reasonableness." Id. At 765-66.

In Crosby, the Court of Appeals determined that it would remand most pending appeals involving challenges to sentences imposed prior to Booker "not for the purpose of a required resentencing, but only for the more limited purpose of permitting the sentencing judge to determine *whether* to resentence, now fully informed of the new sentencing regime, and if so, to

resentence." Crosby, 397 F.3d at 117.  In this respect, the Court of Appeals explained that a remand would be necessary to learn "whether a sentencing judge would have imposed a materially different sentence, *under the circumstances existing at the time of the original sentence*, if the judge had discharged his or her obligations under the post-Booker/Fanfan regime and counsel had availed themselves of their new opportunities to present relevant considerations." Id. (emphasis added).

This statement of the purpose for Crosby remands makes clear that certain issues are simply irrelevant to this Court's determination whether to re-sentence.  Specifically, because this Court must determine whether to re-sentence based on "the circumstances existing at the time of the original sentence," id., arguments relating to post-sentencing factors are irrelevant.  In short, the court must determine whether it would have imposed a non-trivially different sentence if the Sentencing Guidelines had been advisory at the time of the original sentence, and under the circumstances existing at the time of the original sentence.

III.     **There is No Compelling Reason to Re-Sentence in this Case Because the Court Carefully Considered All of the Relevant Sentencing Considerations at the Time of Sentencing and Sentenced the Defendant to Life – the Only Appropriate and Reasonable Sentence for Someone whose own Mother Stated that "He Likes to Shoot People Just to See Their Reaction" and for whom the PSR Concluded that "There is Almost Nothing Positive that can be said in this Case, Other Than it is Fortunate that the Defendant only Murdered One Individual."**

Sentencing in the post-Booker regime, as explained in Crosby, now involves two analytic stages: first, a determination of the applicable Guidelines range (including any departures); and second, a determination of whether in light of the Guidelines and the other factors listed in 18 U.S.C. §3553(a), there is any reason to impose a non-Guidelines sentence.  Crosby, 397 F.3d at 113.  A review of the record in this case demonstrates that the Court already engaged in such an

analysis. Moreover, in view of this defendant's murderous and violent actions, his extensive involvement in narcotics trafficking, his lengthy criminal record, and, particularly in light of the conclusions set forth in the PSR and the Court's comments at sentencing, it is apparent that the Court would not likely have imposed a non-trivially different sentence if the Sentencing Guidelines had been advisory.

The district court in this case presided over nearly six weeks of evidence in a trial in January and February 2003. The court also reviewed and considered extensive briefing, and held extensive oral argument in connection with this, and other defendants' post-trial motions for judgment of acquittal and/or a new trial. During the course of those proceedings, as well as during other related proceedings, the court, on several occasions, noted its having extensively and thoroughly reviewed, and re-reviewed, the trial evidence and transcripts.

At the original sentencing in this case, the district court, well versed in the evidence at trial and the overall record, conducted a thorough analysis in reaching its determination of what it believed to be the appropriate Guidelines range for the defendant. At the defendant's sentencing hearing on April 12, 2004, the court also carefully considered the defendant's arguments regarding the gun enhancement and the quantity attributable to the defendant; as well as the defendant's arguments in favor of a minor role adjustment and ultimately, for a downward departure based upon his claim of wrongful conduct of the victim that contributed significantly in provoking the offense conduct of the defendant.

The defendant's Guidelines were calculated in the Pre-Sentence Report ("PSR"), which the district court adopted as its findings, see Sentencing Transcript dated April 12, 2004 at 96-99; 102-03, as follows:

4

**Group One: Count One, Act One, Count Twelve – Drug Conspiracy**

| | |
|---|---|
| Drug Quantity (1.5 kilograms or more of cocaine base) U.S.S.G. §2D1.1(c)(1) | 38 |
| Use of Firearm(s) in Connection with the Offense | +2 |
| Adjustment for Role in the Offense: None | 0 |
| Victim Related Adjustment: None | 0 |
| Adjustment for Obstruction of Justice: None | 0 |
| Adjusted Offense Level (Subtotal): | 40 |

**Group Two: Count One, Acts 2A, 2C, Counts Three and Five – Conspiracy / Attempted Murder of Rodrick Richardson**

| | |
|---|---|
| VCAR / Attempted Murder – U.S.S.G. §§2E1.1(a)(2), 2A2.1(a)(1) | 28 |
| Victim Suffered Serious Bodily Injury – U.S.S.G. §2A2.1(b)(1)(B) | +2 |
| Adjustment for Role in the Offense: None | 0 |
| Victim Related Adjustment: None | 0 |
| Adjustment for Obstruction of Justice: None | 0 |
| Adjusted Offense Level (Subtotal): | 30 |

**Group Three: Count One, Acts 3A, 3B Conspiracy / Attempted Murder of Marquis Young**

| | |
|---|---|
| VCAR / Attempted Murder – U.S.S.G. §§2E1.1(a)(2), 2A2.1(a)(1) | 28 |
| Victim Suffered Permanent Bodily Injury – U.S.S.G. §2A2.1(b)(1)(A) | +4 |
| Adjustment for Role in the Offense: None | 0 |
| Victim Related Adjustment: None | 0 |
| Adjustment for Obstruction of Justice: None | 0 |

| | |
|---|---|
| Adjusted Offense Level (Subtotal): | 32 |

**Group Four: Count One, Act 4**

| | |
|---|---|
| VCAR Murder / First Degree Homicide – U.S.S.G. §§2A1.1(a) | 43 |
| Specific Offense Characteristics: None | 0 |
| Adjustment for Role in the Offense: None | 0 |
| Victim Related Adjustment: None | 0 |
| Adjustment for Obstruction of Justice: None | 0 |
| Adjusted Offense Level (Subtotal): | 43 |

| | Adjusted Offense Level | Units |
|---|---|---|
| Group One | 40 | 1 |
| Group Two | 30 | 0 |
| Group Three | 32 | 0 |
| Group Four | 43 | 1 |
| Total Number of Units: | | 2 |
| Increase in Offense Level Based on Total Number of Units: | | 2 |
| Highest Adjusted Offense Level: | | 43 |
| Combined Adjusted Offense Level: | | 45 |
| Adjustment for Acceptance of Responsbility: None | | 0 |
| Total Offense Level: | | 43 |

See PSR ¶¶ 44-70; see also Sentencing Transcript, 4/12/2004 at 96-98.

Both the PSR and the Court also determined the defendant to be squarely in Criminal

History Category VI, not only in light of his status as a Career Offender, but also because the defendant's criminal history points, even absent Career Offender status, totaled 22 – placing him well beyond the minimum points necessary for Category VI.  See PSR ¶¶71-80; see also also Sentencing Transcript, 4/12/2004 at 102-03.

A total offense level 43 with a criminal history category VI, resulted in an applicable Guidelines range of life.

During the course of the sentencing proceedings the Court carefully considered the Guidelines issues argued by the defendant as well as the defendant's arguments for downward departure.  Moreover, the Court's comments during those proceedings strongly suggest that it would not have imposed a non-trivially different sentence if the Sentencing Guidelines had been advisory.  First, with respect to the gun enhancement issues argued by the defendant, the Court stated:

> My recollection, and I will tell you what my recollection is and the testimony is that guns were kept at 27 Lincoln Avenue.  They were available to the Defendant for his use.  That he bagged drugs at that address and there were guns at that address.  I believe there's also testimony, my recollection, correct me if I'm wrong, that Mr. Buchanan got a Mack 11 from that address and brandished it . . . I thought there was testimony that Mr. Buchanan carried a bag of guns from the stash house from the Lincoln Avenue address at the request of Kelvin Burden in connection with the dispute.  I think it was with the Hill Crew at the time.  And lastly, and I know the defendants have vigorously fought and argued that the violence did not relate to the drug dealing, but the jury rejected that finding, and the Court has as well, and there's no question that this defendant possessed a firearm when he fired into the car and killed Derek Owens and Marquis Young.  And the jury's finding, which the Court has upheld, ties that to the drug dealing.

Sentencing Transcript, 4/12/2004 at 63.  With respect to the drug quantity issues raised by the defendant, the Court stated:

> I will tell you what's on my mind.  You tell me if I have a misimpression of the

7

> record. Mr. Buchanan was involved in more than one episode of violence and all of that violence was related to certainly Kelvin Burden[']s group. The jur[y] found that group to be an enterprise, to find that it's objective was to sell drugs [sic]. So if I have a person who is an enforcer and intimidator or wreaking vengeance person in that group who is well aware of the drugs and the amount of quantity of drugs that is going through the organization, I don't think you could argue about that, that Mr. Buchanan, he didn't think he was the only person buying 7 to 14 grams a week and he knew he brings Godfrey in. There's another one. He sees people in and out of the house. He knows people. He's on various maniac block and he intended to sell. He sees other people that have gotten drugs from Kelvin . . . .

Sentencing Transcript, 4/12/2004 at 72. In addition, the Court reasoned:

> With regard to the drug quantity, the Court would note that more than a year ago, in January, early part of February last year, there was nearly five weeks of testimony regarding the Burden organization which involved a lot of testimony about drug dealing and about violence. At the conclusion of that trial the jury's verdict on count 12 of the indictment, which was the drug conspiracy, the jury found that this Defendant had attributable to him 50 grams or more of cocaine base, more than 5 kilograms of cocaine powder. The Court has already ruled. I made a lot of rulings in connection with the jury's verdict in upholding it or not in one instance. In connection with the new trial motions, the Court has in effect upheld or agreed with the Government's argument to the jury, which the jury certainly found the acts of violence, that Mr. Buchanan was in fact an enforcer for Mr. Kelvin Burden and his drug dealing organization, and in addition to that, Mr. [Buchanan] assisted in the packaging of crack cocaine for distribution to street dealers . . . .And also he dealt drugs himself on a pretty regular basis. There was testimony by both Lavon Godfrey, Reginald Joseph, I think is his first name, if I have that right, about this Defendant's involvement with the Kelvin Burden operation between '97 and '99, which the Court credits. Under the guideline relevant [] conduct provisions, the quantity of drugs to be attributed to Mr. Buchanan requires me to look at all of the relevant conduct . . . .
>
> The evidence with respect to Jermaine Buchanan's involvement here in the Burden organization has him actively involved from the beginning when the conspiracy is alleged until certainly the time he's incarcerated in late October, early November time period 1999. He continued to indicate his involvement in connection with the Burden organization while imprisoned, but the Court will not consider that time period in addressing this question of jointly undertaken activity and quantity. Mr. Buchanan was himself a street dealer and as we have already discussed, he was buying and selling on the streets of Norwalk at various locations, the maniac block, King Kennedy, somewhere between 7 and 14 grams of crack cocaine roughly every week for a two-year period . . . . In addition, there was testimony of Mr. Buchanan

being present at Lincoln Avenue, which was the center point, and while the Les' New Moon Cafe was a place where folks went, basically drugs were stored and bagged up and weapons were maintained at the Lincoln Avenue address . . . The testimony is that Jermaine Buchanan was present at that address from time to time and there was testimony he was involved in bagging up drugs at that address. Defense counsel is correct that there's no precise testimony about the number of occasions, but the Court is going to draw the inference that given that the quantities that would be bagged up by Kelvin Burden involved from a quarter to one kilogram of what had been converted from powder into crack, nonetheless in those quantity ranges, that even giving Jermaine Buchanan the benefit of the doubt on his own sales, let's say that over the two-year period he sold one kilogram of crack cocaine, that the Court is going to conclude based on a preponderance of the evidence that the evidence supports the conclusion that he was present while bagging up on more than two occasions at least a quarter of powder cocaine that had been converted into crack. In other words, the Court's conclusion is he was more than likely present at more than those three occasions of the smallest quantity that's been testified to. But that – that few occasions and that small amount still will put him over the 1.5 himself as being involved in . . . . However, it is the Court's finding in this case that Jermaine Buchanan was involved in the Kelvin Burden drug operation. And in a way that other street dealers – I say other because he himself was a street dealer, but that he was unlike other street dealers. The Court comes to that conclusion in part based upon testimony like that of Lavon Godfrey that he's present at the stash house and that he's bagging up . . . . The Court comes to that conclusion because of Mr. Buchanan's role in terms of violence in connection with the Kelvin Burden organization . . . . there are many instances where there are violent flare ups between persons dealing drugs for Kelvin Burden and other persons in Norwalk who were themselves involved in violence and drugs . . . the Court cannot overlook the fact that this Defendant and others were engaged in a large scale distribution of drugs in Norwalk and that because of that, violence occurred and continued, and this Defendant was invovled in much of the violence related to the Kelvin Burden organization. And so it is the Court's conclusion that there is sufficient evidence from which the Court can draw its conclusion that his Defendant handled more than 1.5 kilograms of crack cocaine.

Another fact that I would rely on . . . the jury's finding about the powder cocaine . . . that the powder was converted to crack and that conversion alone would be sufficient to trigger the maximum quantity. Even if my inferences are unreasonable as far as what actually went through this Defendant's hands or for which under the guidelines he jointly undertook to engage in this activity with Kelvin Burden and that he was involved in activities that was in furtherance of this jointly undertaken criminal activity of more than 1.5 kilograms of crack and that it was reasonably foreseeable to him that that quantity would be the focus of this jointly undertaken activity, the Court would find that his involvement in violence on behalf of and in

>connection with Kelvin Burden is connected to the drug dealing, and to the extent he was an enforcer or a person out to protect Kelvin Burden and himself, that that was activity which was taken to further the overall drug conspiracy and the overall drug conspiracy quantity. Put another way, the Court finds that the violence advanced the interest of and protected Kelvin Burden's entire organization. And further the Court concludes that Jermaine Buchanan was a part of the core drug distribution . . . The Court finds . . . that the quantity attributable to Mr. Buchanan is more than 1.5 kilograms.

Sentencing Transcript, 4/12/2004 at 83-94.

The Court also carefully considered and rejected the defendant's related argument for a minor role adjustment, pursued in light of the Court's finding the maximum guideline quantity to be attributable to the defendant. In rejecting a minor role adjustment, the Court commented:

>Were the Defendant's conduct to be limited solely to street dealing, the Court might be inclined to grant this adjustment, but as I have indicated, and I will state it again in connection with this ruling, the Court's view of this Defendant, Mr. Buchanan, is that he was – he was at the core of this conspiracy. He was involved in all aspects of it.
>
>As I have indicated, his involvement with the violence implicates him and particularly given his knowledge of the quantities involved in this conspiracy, implicates him in supporting that volume and that size conspiracy . . . he is involved both at the stash house in the drug distribution itself as well as on the street in connection with either acting to protect Kelvin Burden or himself and others involved in Kelvin Burden's drug conspiracy. For all those reasons, therefore, the Court declines to award a minor role adjustment.

Sentencing Transcript, 4/12/2004 at 95-96.

After determining the applicable Guidelines range, see Sentencing Transcript, 4/12/2004 at 96-98 and at 102-03, the Court went on to carefully consider the defendant's claims for a downward departure from the murder Guideline, based upon his claim that wrongful conduct by the victim contributed significantly in provoking the offense conduct of the defendant. Significantly, the Court suggested, or at least implied, that even if the wrongful conduct of

Marquis Young could be considered as provocation in connection with the death of Derek

Owens, Buchanan's circumstances would still not cause the Court to depart:

> But tell me what Derek Owens did that was wrongful. Isn't that your biggest hurdle here? We could probably argue about, and not probably, you would have a lot to talk about, maybe about Mr. Young. *I don't mean to suggest I would depart.*

Sentencing Transcript, 4/12/2004 at 106 (emphasis added). The Court nevertheless appropriately

focused on the reasonable inquiry – whether and how the decedent, Derek Owens, committed any

wrongful conduct towards the Defendant:

> We have a victim here, the murder victim, who – a victim that causes the level 43 to be triggered here. A level that obviously drives the guideline range. Who other than going around with Marquis Young, made no – I know of no record evidence that he made any threat to Mr. Buchanan. And I think that while I don't know what Mr. Buchanan would say, because obviously he has his right to remain silent, but even if I were to assume that he acknowledged he committed the crimes, he was sorry that Mr. Owens got in the middle, I think that he nonetheless intended to discharge a firearm on a number of occasions while sitting on the right side of a car next to a vehicle in which Mr. Owens is in the driver seat and therefore first in the line of fire of the fire he's discharged. I don't know what wrongful conduct of Mr. Owens provoked that response.

Sentencing Transcript, 4/12/2004 at 107-08.

Significantly, the Court also expressed its view that this Defendant's participation in the

long running efforts to kill Marquis Young, which resulted in the death of Derek Owens, was still

"premeditated murder," see Sentencing Transcript, 4/12/2004 at 116, and that the Court's

"recollection of the record is that on the night of July 1, 1999, nothing had occurred in immediate

relationship to that date other than a plan by the people in that car in which your client was riding

to find Marquis Young." Id. at 120. The Court concluded:

> There's no question in this Court's mind based on the testimony that this Defendant, Jermaine Buchanan, intended to and knowingly killed Derek Owens. He intended to do so by the firing of multiple rounds into the car in which Derek Owens was

11

> seated. He did so from the passenger's side of a car as it drove slowly by Derek Owen's car and Derek Owens was in the driver's side of that car; therefore going to be the person to take the first line of bullets as they were poured into that vehicle that was parked on the side of the road . . . the Defendant did intend to kill and – he intended to do the acts which indeed killed Derek Owens.

Sentencing Transcript, 4/12/2004 at 122. The Court continued:

> The record is absolutely devoid of any evidence of provocation or any wrongful conduct that contributed, let alone significantly, to [Derek Owens'] premeditated murder. That he was with Marquis Young on some occasions when Marquis Young was making threatening statements, running his mouth, trash talking, however it is characterized, even in making a direct threat, doesn't mean that Derek Owens engaged in any wrongful conduct. The fact that Derek Owens dealt drugs, while it is wrongful conduct, it cannot be said by any stretch of the imagination to have been conduct which contributed, let alone significantly, to his premeditated murder by this Defendant.

Sentencing Transcript, 4/12/2004 at 127. Significantly, the Court *expressly stated that*, even if it were to take a broader view of provocation or somehow "transfer" the wrongful conduct of Marquis Young to the offense conduct involving the murder of Derek Owens, *the Court would still decline to depart or otherwise impose a sentence other than that suggested by the Guidelines calculation:*

> If the Court is mistaken and that defense counsel is correct that the Court needs to not parse out so narrowly the victim's conduct but rather to look at all of the conduct of the two victims for the conduct, that is the driving conduct here in the guidelines, that is the shooting of this car on the night of July 1st$^t$, *the Court would still be inclined and would not find a basis to conclude that this Defendant fits within the parameters of 5K2.0.* That Marquis Young threatened Kelvin Burden on a number of occasions or taunted him, tried to incite him and eventually came to threaten indirectly Jermaine Buchanan through the mother of his children, the Court will assume for the purposes of this analysis. However, the Court is persuaded by the Government's view of what happened here and that is that the desire to get Marquis Young, to punish Marquis Young for his role in the murder of Sean Burden was a plan, or a view, or an idea that had been around for quite a while before Marquis Young, the incidents that we have heard about today and the threats or taunts that occurred in the late spring and early summer of 1999. Further the Court – while the Court does not deny or – the Court credits the testimony of the threat through this defendant's baby

12

> mother, essentially the threat was aimed at Kelvin Burden. Whether it is because he was the head of this drug organization or just because it was Kelvin Burden isn't important to what the Court is about to say . . . I would have difficulty and I do have difficulty finding that contributed significantly because . . . again, this is on my alternative analysis about whether I view the wrongful conduct to have been encompassed, I can't read this section to have intended to permit the Defendant to plan and engage in a driveby shooting of people sitting in a car making no threats to them at all because of a confrontation that occurred in which – whether it's – under the Les' New Moon shooting was maybe – at least it was a week before the driveby shooting of Derek Owens and Marquis Young and the Freddie Fixer threat, which had to have been a month or more before, which again I find directed to Kelvin Burden. To conclude that that significantly provokes the shooting of these two people sitting in the car would mean that when anyone a person is associated with is threatened, that persons around them are justified – again it is not a justification offense, but nonetheless, their conduct will be punished to a diminished extent or to a lessened extent if they are to go and react to that threat. *I guess what I am saying is that to the extent I'm wrong in analyzing the victim's wrongful conduct in concluding that it should be read to be Derek Owens and that Derek Owens did not engage in any wrongful conduct towards the Defendant or that could be said in any way to contribute significantly to this murder, if the Court is wrong in that first ground, the Court would conclude that even if I could consider Marquis Young's conduct vis-a-vis Kelvin Burden as to this Defendant in regard to the murder of Derek Owens, the Court would choose not to exercise its discretion to depart as recognized that I have that discretion by 5K2.1.*

Sentencing Transcript, 4/12/2004 at 128-30. The Court then proceeded to impose its sentence of a term of life on Counts One, Two and Twelve of the Third Superseding Indictment, and for a term of ten years on Counts Three and Five, all terms to run concurrently. Id. at 131.

In light of the district court's careful consideration of all of the applicable sentencing issues at the original sentencing, and its having extensively and thoroughly reviewed the record evidence to carefully arrive at the sentence which it imposed – including its full consideration of the defendant's arguments in favor of a sentence of less than life on the basis of provocation – there is simply no compelling reason to revisit the Court's sentence with a resentencing. The record is entirely devoid of any comment or suggestion by the Court that it was somehow

constrained by the Guidelines, or that it would have reached different conclusions or arrived at a different sentence if the Court were not constrained by the then-mandatory nature of the Sentencing Guidelines. Accordingly, there does not appear to be any suggestion in the record that the Court would have imposed a non-trivially different sentence if the Sentencing Guidelines had been advisory. Indeed, to the contrary, the Court made alternate findings that, even if it could consider the defendant's arguments in the way suggested by counsel for the defendant, it would nevertheless decline to exercise its discretion to depart or otherwise impose a sentence other than that suggested by the Guidelines calculation. See, e.g., Sentencing Transcript, 4/12/2004 at 128-30. In short, on this record, it appears that the District Court had every intention of sentencing the defendant to the term of life imprisonment that it imposed.

Perhaps more importantly, in the Government's view, the Court's carefully considered – and wholly appropriate – sentence reflected this Defendant's numerous acts of violence, his extensive involvement in narcotics trafficking, his lengthy criminal record, and his conviction for the totally depraved shooting that resulted in the killing of Derek Owens and the rendering of Marquis Young a paraplegic.

Moreover, under the law as announced in Booker and Crosby, the defendant, Jermaine Buchanan, received a just and reasonable sentence. The Court sentenced the defendant in this case to a term of imprisonment within his Guidelines range. See 18 U.S.C. § 3553(a)(4) (court must consider the defendant's Guidelines range). Moreover, the Guidelines sentence ensured that the defendant received a term of imprisonment commensurate with other defendants, nationwide, who had similar records and committed similar offenses. Id. § 3553(a)(6) (court must consider need to avoid unwarranted sentence disparities).

The sentence imposed in this case was also reasonable because it served several purposes of punishment as identified in § 3553(a). Specifically, the sentence in this case reflected the serious, violent and murderous "nature and circumstances of the offense," § 3553(a)(1), the need for the sentence to provide "adequate deterrence to criminal conduct," § 3553(a)(2)(B), and the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," § 3553(a)(2)(A).

Moreover, the Court imposed this entirely appropriate sentence only after considering the defendant's personal history and characteristics, at the time of the original sentencing. Id. § 3553(a)(1) (court must consider "the history and characteristics of the defendant"). That personal history and the defendant's circumstances and characteristics, were perhaps best described in the final comments of the PSR:

> Twenty five year old Jermaine Buchanan was feared within the South Norwalk Community. He deservedly had a reputation as someone willing to shoot and kill. As such, he was a valuable asset to the Burden Organization as violence and intimidation is an essential element in the success of street level narcotics trafficking.
>
> . . . Like many other young minority males from inner-city areas, the defendant came from a troubled home where there was alcoholism, neglect, violence and sexual abuse. However, it does not readily explain the person Jermain Buchanan became. He has clearly expressed anger, even hatred towards his biological father, who left the family when the defendant was 2, and in the defendant's own words, "lied and broke promises." Regardless, this also doesn't explain the defendant's determination to develop the heartless reputation he established.
>
> Some of those closest to the defendant have attempted to understand his life of violence. *His mother stated that he likes to shoot people just to see their reaction . . . One of the mothers of his children stated that he always wanted a "rep" on the streets, and that's what he got. The defendant articulated this very clearly to an officer of the Norwalk Police Department when he stated, "You don't know my M O, I shoot people . . ."*
>
> *There is almost nothing positive that can be said in this case, other than that it is*

> *fortunate that the defendant only murdered one individual. Derek Owens was truly in the wrong place at the wrong time, and got in the way of the bullets meant for Marquis Young. Marquis Young is fortunate to be in a wheelchair and not in a grave, although he might not see it that way. Roderick Richardson is fortunate that he survived being killed by the defendant by sheer luck, and the South Norwalk Community is arguably fortunate, that the defendant is now facing a life sentence.*

PSR ¶¶ 118-21.

On this record – and in light of the defendant's murderous and violent actions, his extensive involvement in narcotics trafficking, his lengthy criminal record, and, particularly in light of the conclusions in the PSR described above and the Court's comments at sentencing which give no indication that the Court would have imposed a different sentence were it not constrained by the then-mandatory Guidelines – it is apparent that the Court would not likely have imposed a non-trivially different sentence if the Sentencing Guidelines had been advisory.

### IV.  Conclusion

For the foregoing reasons, in conformity with the procedures outlined in <u>Crosby</u>, this Court should indicate, for the record, that after consideration of the defendant's Guidelines range and all of the factors listed in 18 U.S.C. § 3553(a), the defendant should not be re-sentenced.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY


STEPHEN B. REYNOLDS
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT19105
UNITED STATES ATTORNEY'S OFFICE
915 LAFAYETTE BOULEVARD
BRIDGEPORT, CT 06604
(203) 696-3000
(203) 579-5575 (fax)
Stephen.Reynolds@usdoj.gov

## **CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing was forwarded by mail on July 21, 2005 to:

William Koch, Esq.  
151 Brush Hill Road  
Lyme, Connecticut 06371

Jeremiah Donovan, Esq.  
P. O. Box 554  
Old Saybrook, Connecticut 06475

This is also to certify that a courtesy copy of the foregoing was hand-delivered on July 21, 2005 to:

The Hon. Janet C. Hall  
United States District Judge  
United States Courthouse  
915 Lafayette Boulevard  
Bridgeport, Connecticut 06604

Ray Lopez  
Senior United States Probation Officer  
U.S. Probation Office  
915 Lafayette Boulevard  
Bridgeport, Connecticut 06604

_____  
STEPHEN B. REYNOLDS  
ASSISTANT UNITED STATES ATTORNEY